SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00263-AB-02** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **GERSON ARGUETA-RODRIGUEZ,** | |
| **Defendant.** | |

The government asks the Court to impose a sentence of 12 months' imprisonment, to be followed by a three-year term of supervised release.  This is the same sentenced received by the co-defendant Mr. Edwin Said Chacon-Trejo and while it is a lesser sentence than what the government was originally seeking for both defendants, in fairness the government believes this defendant should receive the same sentence as his co-defendant.

The defendant, a street-level fentanyl dealer, was involved in selling an incredibly addictive, destructive, and deadly poison in downtown Portland, Oregon.  He and his co-defendant were caught on May 22, 2025, as part of another downtown fentanyl enforcement

**Government's Sentencing Memorandum**                                                                 **Page 1**

mission, after they sold fentanyl to a law enforcement informant. Given the nature of the case, defendant's advisory sentencing guidelines, the societal harm caused by fentanyl, the defendant's personal history and characteristics, and the sentence received by the co-defendant, the government believes the requested sentence is both reasonable and justified. The defendant will also be deported to Honduras as a result of his arrest and conviction.

## A.     Summary of Proceedings.

The defendant was arrested on May 22, 2025, during a downtown Portland fentanyl enforcement mission, after he gave his co-defendant Edwin Said Chacon-Trejo approximately 28 grams of fentanyl that Mr. Chacon-Trejo in turn sold to a law enforcement informant.

On May 27, 2025, both defendants made their initial appearance in federal court on a criminal complaint. On June 18, 2025, both defendants were indicted by the grand jury. On January 8, 2026, the defendant pled guilty to Count 2 of the Indictment which charged him with the Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). The maximum sentence the Court may impose is a term of 20 years' imprisonment, fine of $1,000,000, and at least three years of supervised release. There is also a $100 fee assessment.

A Presentence Report (PSR) has been completed. The government has no objection to the PSR and believes the facts underlying the defendant's count of conviction (PSR ¶¶ 19 - 23), Sentencing Guideline calculations (PSR ¶¶ 28 - 37), and Criminal History (PSR ¶¶ 40-41), are accurately outlined in both the PSR and plea agreement. In his plea agreement defendant admitted that:

///

///

**Government's Sentencing Memorandum**                                                    **Page 2**

> [O]n or about May 22, 2025, in downtown Portland, within the District of Oregon, he distributed fentanyl. The defendant knew the substance was fentanyl. Fentanyl is a Schedule II controlled substance.

Plea Agreement ¶ 6.

The defendant was arrested during a downtown Portland fentanyl enforcement mission was conducted by the Federal Bureau of Investigation (FBI), Portland Police Bureau's Central Precinct Neighborhood Response Team (NRT) and Bike Squad, Clackamas County Interagency Task Force (CCITF), and the United States Attorney's Office for the District of Oregon (USAO) (collectively the "Investigators"). Since the beginning of 2024, Investigators have been conducting coordinated missions targeting fentanyl dealers working primarily in the area of downtown, Portland, Oregon, to include neighboring communities. These missions have been aimed at reducing both the criminal activity associated with fentanyl dealers and the amount of fentanyl being sold in downtown Portland, Oregon.

Prior to the May 22, 2025, mission, a law enforcement informant had identified the co-defendant Edwin Said Chacon-Trejo, known to him as "Nenuo," as a street-level fentanyl dealer who was operating in the area near the Oregon Department of Motor Vehicle (DMV) office located at 1502 SW 6th Ave. Portland, Oregon. The informant approached Edwin Said Chacon-Trejo who confirmed he was selling fentanyl and then he gave the informant his phone number to call if the informant wanted to buy fentanyl.

On May 22, 2025, Investigators had the informant call Edwin Said Chacon-Trejo and order an ounce of fentanyl, which the co-defendant agreed to sell. After agreeing on the amount and time, Mr. Chacon-Trejo provided the informant with the cross streets of 6th and Clay, in downtown Portland, Oregon, in which to complete the deal. Prior to the deal, Investigators

**Government's Sentencing Memorandum** **Page 3**

provided the informant with cash and on one of the bills they placed a piece of tape with the words: "Fetty Kills."[1]



Criminal Complaint ¶ 14.



Criminal Complaint ¶ 10.

Investigators then set up in the area of SW 6th Ave. and SW Clay St., in Portland, Oregon, and quickly observed two males, who appeared to be together, making what appeared to be multiple hand-to-hand exchanges with who Investigators believed to be drug customers. These two individuals turned out to be the defendant Gerson Argueta-Rodriguez and his co-defendant Edwin Said Chacon-Trejo. At the direction of Investigators, the informant walked to

---

[1]      "Fetty" is a common term used by both dealers and users to refer to fentanyl.

**Government's Sentencing Memorandum**                                                    **Page 4**

the deal location and called Edwin Said Chacon-Trejo to inform him that he had arrived. The informant was also carrying a listening device which allowed Investigators to monitor events. The informant was subsequently greeted by the co-defendant Edwin Said Chacon-Trejo who asked the informant what they needed and how much they had. When the informant told Edwin Said Chacon-Trejo they wanted an ounce of fentanyl he told the informant they did not have the specific amount of fentanyl requested and asked the informant if they would wait for his brother to arrive. The informant provided Edwin Said Chacon-Trejo with the buy funds and a short time later, the defendant Gerson Argueta-Rodriguez approached both the informant and Edwin Said Chacon-Trejo. The defendant Gerson Argueta-Rodriguez provided prepackaged baggies of fentanyl to Edwin Said Chacon-Trejo, who in turn then provided them to the informant. Once the deal was complete, they all parted ways.

After the deal was done, Investigators activated their lights and sirens and moved in to arrest both defendants and they in turn started to run from the Investigators. Investigators were able to detain both men and conducted a search of their persons. A search of Gerson Argueta-Rodriguez found additional prepackaged baggies containing approximately 30 grams of fentanyl. A search of Edwin Said Chacon-Trejo found bulk U.S. Currency and a very small clear package baggie containing, what we would estimate was approximately less than a gram of a white powdery substance consistent with the appearance of fentanyl. The buy money used to purchase the fentanyl was recovered from Edwin Said Chacon-Trejo. After the deal, the informant handed over approximately 28 grams of fentanyl purchased from the defendants. In total, Investigators seized approximately 58 grams of fentanyl (the purchase of approximately 28 grams from the co-

///

**Government's Sentencing Memorandum**                                    **Page 5**

defendant Edwin Said Chacon-Trejo and the seizure of approximately 30 grams seized from

defendant Gerson Argueta-Rodriguez).  The fentanyl and cash seized are depicted below.

 

Criminal Complaint ¶ 13.

While some may look at this picture and opine this was only a small amount of fentanyl,

to do so vastly underscores the harm associated with fentanyl.  Fentanyl kills – even in very

small amounts.  To put the amount of fentanyl the defendants were selling into context, a user of

powdered fentanyl will often burn it on a piece of foil and inhale the smoke.  Some users will

simply snort the powdered fentanyl.  A user of powdered fentanyl will typically use it in

quantities of less than 1/10 of a gram at a time.  Two milligrams is a potentially lethal dose of

fentanyl for an average adult.  *Fentanyl: What You Should Know*, HEALTH BEAT, Northwestern

Medicine (January 2025).  The 28 grams of powdered fentanyl that was sold to the informant is

28,000 milligrams, or approximately 14,000 potentially lethal doses of fentanyl.  The 30 grams

**Government's Sentencing Memorandum**                                                    **Page 6**

seized from defendant Gerson Argueta-Rodriguez is 30,000 milligrams, or approximately 15,000 potentially lethal doses of fentanyl.

**B.      Sentencing Guideline Calculations.**

The Court, "in determining the particular sentence to be imposed," is required to consider the "sentencing range established" by the U.S. Sentencing Guidelines.  18 U.S.C. § 3553(a)(4). "The Guidelines are 'the starting point and the initial benchmark,'. . . and are to be kept in mind throughout the process."  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting *Kimbrough v. United States*, 552 U.S. 85, 108 (2007)).  "All sentencing proceedings are to begin by determining the applicable Guideline range."  *Id*.

Based upon the amount of fentanyl the defendant distributed and possessed with intent to distribute, his initial Base Offense Level is 24, pursuant to U.S.S.G. § 1B1.3 and 2D1.1(a).  PSR ¶ 28, Plea Agreement ¶ 8.  This offense level is not in dispute.

Because the defendant satisfies the "safety valve" criteria in 18 U.S.C. § 3553(f) and U.S.S.G. § 2D1.1(b)(18), the government and U.S. Probation Office are asking the Court to grant him a two-level downward departure in his Sentencing Guidelines.  PSR ¶ 29, Plea Agreement ¶ 9.

Because the defendant qualifies as a "Zero Point Offender," pursuant to U.S.S.G. § 4C1.1, the parties will recommend a two-level downward departure in defendant's Sentencing Guidelines range.  PSR ¶ 34, Plea Agreement ¶ 10.

Based upon defendant's guilty plea and acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, the parties ask that the Court grant the defendant a three-level reduction in his offense level.  PSR ¶¶ 35 – 36, Plea Agreement ¶ 11.

**Government's Sentencing Memorandum**                                           **Page 7**

Prior to any additional departures or variances, the defendant's initial Adjusted Offense Level is 17. With a Criminal History Category of I, defendant's initial advisory sentencing guideline range is 24 to 30 months' imprisonment.

Pursuant to 18 U.S.C. § 3553(a), based upon the nature of the offense, the history and characteristics of the defendant, defendant's indication at an early stage in the proceedings about his desire to resolve his case, how similarly situated defendants have been handled by the USAO and the courts, and to achieve a fair and just resolution of the case, the government will recommend that the Court to grant the defendant a three-level downward variance in his overall offense level. Plea Agreement ¶ 12. The U.S. Probation Office has concurred in the request for a variance. PSR Sentencing Recommendation at *1.

At a time when the state system has often been unable to detain or even prosecute many of these downtown fentanyl dealers – thus allowing them to continue selling fentanyl in the community with impunity – such early resolution offers have allowed the federal government to step into the breach and prosecute more of these downtown fentanyl dealers cases that we otherwise would, while still achieving very fair and just sentences. A three-level 3553(a) reduction would result in an Adjusted Offense Level of 14 and with a Criminal History Category of I, and advisory sentencing guideline range of 15 to 21 months' imprisonment.

Defendant has been in federal custody since his arrest in Portland on May 22, 2025.

**C.    Government's Recommended Sentence.**

Pursuant to 18 U.S.C. § 3553(a), we ask the Court to impose a sentence of 12 months' imprisonment, to be followed by a three-year term of supervised release.

///

**Government's Sentencing Memorandum**                                                    **Page 8**

The defendant was selling fentanyl in downtown Portland.  Fentanyl is an extremely addictive, destructive, and deadly poison that has been devastating the community.  According to law enforcement:

> Fentanyl and methamphetamine remain the primary drug threats, affecting community livability and contributing to drug-related overdose deaths and criminal activity, including crimes against persons and property in the HIDTA region.  In 2023, fentanyl was linked to 75.9% of overdose deaths in Oregon and 51% in Idaho.  Methamphetamine was present in 63.5% of Oregon's overdose deaths and 38% of Idaho's.  Together, these two substances accounted for 41.3% of overdose fatalities in both states.

OREGON-IDAHO HIGH INTENSITY DRUG TRAFFICKING AREA (HIDTA) 2026 THREAT ASSESSMENT, 2025, at 5 (https://oridhidta.org/reports).

The death toll from fentanyl is truly frightening.  For Americans aged 18 to 45, overdoses – primarily the result of illicit fentanyl – remain the leading cause of death.  *CDC Reports Nearly 24% Decline in U.S. Drug Overdose Deaths*, CDC NEWSROOM (Feb. 25, 2025); *DEA Administrator on Record Fentanyl Overdose Deaths,* GET SMART ABOUT DRUGS (August 17, 2024).  In 2022, within the United States, fentanyl was responsible for an average of more than 200 deaths every day and a total of 73,654 people died from fentanyl overdoses.  *Are Fentanyl Overdose Deaths Rising in the U.S.*, USAFACTS (Sept. 27, 2023).  Here in Oregon, between 2015 and 2021, Oregon experienced a 932% increase in fentanyl overdose deaths.  *Fentanyl by State Report*, FAMILIES AGAINST FENTANYL (Feb. 4, 2023).  In 2022, Oregon alone experienced a total of 839 fentanyl related overdose deaths.  OREGON HEALTH AUTHORITY OREGON DEPARTMENT OF EDUCATION FENTANYL & OPIOID RESPONSE TOOLKIT FOR SCHOOLS (January 2024).  In 2023, within Oregon there were 1,833 overdose deaths, and of those 1,272 were the result of synthetic opioids, such as illicit fentanyl.  *Oregon Overdose Prevention Dashboard*, OREGON HEALTH AUTHORITY (May 1, 2025).  In 2023, "Oregon had the highest rate of increase

**Government's Sentencing Memorandum**                                    **Page 9**

in fentanyl deaths in the nation with a one-year increase of more than 67[%], compared to a national average of 5[%]." *Oregon, Washington see largest increases in fentanyl deaths since last year*, KPTV 12 (Sept. 26, 2023).

Even with the most recent decreases in overdose deaths, both nationally and in Oregon, "[f]entanyl continues to be the primary cause of drug overdose deaths in the United States," to include here within Oregon. *Fentanyl Continues to Be the Leading Cause of Overdose Deaths. What's Being Done to Combat Trafficking into the United States?,* WATCHBLOG: FOLLOWING THE FEDERAL DOLLAR, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (Sept. 4, 2025); *Oregon overdose deaths are down, CDC data shows,* OREGON HEALTH AUTHORITY (May 16, 2025) (While "Oregon's overdose deaths decreased 22% between December 2023 and December 2024, a trend similar to that experienced nationwide . . . The count is still much higher than pre-pandemic years, with 1,480 deaths within that one-year time span, CDC data show."); *U.S. Overdose Deaths Decrease Almost 27% in 2024,* NATIONAL CENTER FOR HEALTH STATISTICS, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC) (May 14, 2025)( https://www.cdc.gov/nchs/pressroom/ releases/20250514) (in 2024 "there were there were an estimated 80,391 drug overdose deaths in the United States – a decrease of 26.9% from the 110,037 deaths estimated in 2023" and of those deaths, in 2023, 76,282 involved synthetic opioids (fentanyl) and in 2024, 48,422 involved synthetic opioids (fentanyl)).

While the government recognizes that the defendant was a street-level dealer and nowhere near being the leader of a drug trafficking group or trafficking substantial quantities of fentanyl, he was nevertheless selling an extremely deadly poison to the users on the street. In his effort to make money he was targeting and preying upon addicts within the core of our city – in

**Government's Sentencing Memorandum**                                    **Page 10**

the same area where many governmental agencies and non-profit groups are valiantly trying to provide treatment and services for these people this defendant was profiting from their addiction and suffering.

Unfortunately, some have misjudgingly downplayed the value of the federal cases that have resulted from these downtown fentanyl enforcement missions and even question their place within the federal court system.  To do so is myopic and ignores the positive impact that such federal prosecutions have brought – especially at a time where other options were unavailable.  The federal prosecution of these downtown Portland fentanyl cases matter – especially to the people living and working within the downtown Portland community.

Several years ago, back in 2022 and 2023, downtown Portland was witnessing notorious open-air drug markets and we were making news for all the wrong reasons.  Kyle Almond, *This is what the fentanyl crisis looks like in a state rethinking its historic drug policy,* CNN, March 2, 2024 (https://www.cnn.com/interactive/2024/03/us/oregon-drug-crisis); Conrad Wilson, '*It's crazy out there': The reasons behind Oregon's deepening drug crisis,* OPB, May 30, 2023 (https://www.opb.org/article/2023/05/30/oregon-worsening-drug-crisis-fentanyl-overdoses).  Downtown fentanyl dealers, like the defendant, were prolific and contributing to higher crime rates; a spike in overdoses, both fatal and non-fatal; and, an overall reduction in the livability of the core part of the city.  To many people, downtown Portland simply felt unsafe – and it was.

At that time far too few street-level fentanyl dealers were being held responsible for their crimes in the state system.  Many downtown fentanyl dealers, if or when they were arrested on local charges, were simply cycling through the state system – often they would be caught, released, and go right back to dealing fentanyl.  They were not being detained and they were

**Government's Sentencing Memorandum**                                                                                  **Page 11**

rarely being held accountable for their criminal conduct. Portland Police officers were regularly reporting that they would arrest fentanyl dealers on state charges and the person would be released from jail and be back on the street dealing again – sometimes even before the arresting officers had even finished their shift. There had to be a better way.

The defendant's federal arrest came as a result of a combined federal and local law enforcement effort that made the investigation and subsequent federal arrest and prosecution of fentanyl dealers who were operating in downtown Portland a priority. Since these joint downtown fentanyl enforcement efforts started, over the past approximately two years, more than 90 fentanyl dealers operating in downtown Portland have been arrested on federal charges, detained in federal custody, and prosecuted in federal court. While the 58 grams of fentanyl the defendant is being held responsible for may seem small, at first blush, cumulatively these joint downtown enforcement efforts have made a tremendous impact and have resulted in the seizure of more than 68 kilograms of fentanyl, the seizure of 43 firearms, and the seizure of more than $510,000 in cash. Sentences, based upon the nature of the cases and the individual defendant's personal history and characteristics, have ranged from more than 10 years in federal prison to credit for time served.

At the same time, within the past year, based upon information provided to our Office by the Portland Police Bureau, the overall crime rates in downtown Portland have decreased, to include a double-digit reduction in violent crime and a gradual increase in community livability. *See also, Portlanders' attitudes about crime and drugs show dramatic change, poll finds. What happened?* OREGONIAN (March 27, 2025). Nationally, data has also shown that aggressive law enforcement actions targeting fentanyl dealers and the supply of fentanyl being sold is seen as a

**Government's Sentencing Memorandum**                                              **Page 12**

contributing factor in the overall reduction in overdose deaths.  Hannah Harris Green and Matt Kiefer, *Overdose in America: analysis reveals deaths rising in some regions even as US sees national decline*, THE GUARDIAN, * 4 (Oct. 17, 2025) ("Of the factors the Guardian analyzed, changes to the amount of fentanyl, and in some cases methamphetamine, in the drug supply, as well as geography, were most strongly linked to changes in overdose deaths.… according to the Guardian's analysis, which also showed that peaks in overdose death rates lined up with peaks in fentanyl prevalence.  The percentage of drug seizures containing fentanyl peaked in 28 states in 2023, the same year that overdoses began to decline nationally.").

The continued prosecution of these fentanyl cases is sending a clear message that if you are going to deal fentanyl in downtown Portland you should expect to be caught and prosecuted in federal court.  And that message is getting out.  While things are not perfect and there are still issues, all anyone has to do is look out upon the city from the windows of the federal courthouse or go for a walk around downtown during the day and they will see that the downtown Portland of today verses downtown Portland of several years ago is noticeably different and getting much better.  While many factors have undoubtedly influenced the recent crime reductions in downtown Portland, federal, state, and local law enforcement teams working together to federally arrest, federally detain, and federally prosecute the fentanyl dealers operating within the core of the city has undoubtably been a positive and contributing factor in enhancing community safety and livability.

Accordingly, after evaluating the competing sentencing factors outlined in 18 U.S.C. § 3553(a) which include the nature and circumstances of the offense; the defendant's characteristics; the need for the sentence imposed to reflect the seriousness of the offense; the

**Government's Sentencing Memorandum**                                    **Page 13**

need for the sentence to promote respect for the law; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to provide just punishment for the offense; the need to protect the public from further crimes of the defendant; and, the need to provide the defendant with needed training or other corrective treatment, and in light of the co-defendant's sentence, we believe a sentence of 12 months' imprisonment is reasonable. We ask the Court to impose it, to be followed by a three-year term of supervised release.

At the time of sentencing we will ask the Court to dismiss Counts 1 and 3 as to this defendant.

There is an appeal waiver.

Following his time in custody the defendant will be deported to Honduras.

Dated: March 25, 2026.                                      Respectfully submitted,

                                                           SCOTT E. BRADFORD
                                                           United States Attorney


                                                           /s/ *Scott Kerin*

                                                           SCOTT M. KERIN, OSB # 965128
                                                           Assistant United States Attorney

**Government's Sentencing Memorandum**                                    **Page 14**